Please all rise. It is a pleasure to hear you. This Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Mary S. Trostoff is presiding. Please be seated. We will now proceed to the case on the copies of 2-1248, Ronald Carlson v. Jerousek. Ronald Carlson, and his appellate, are here on behalf of the plaintiff's appellate, Mr. Michael W. Rasek. Are here on behalf of the plaintiff's appellate, Ms. Melissa H. Rasek. Mr. Rasek. Good morning, Your Honors. Michael Rasek, I'm here on behalf of the Mr. Carlson. This, of course, is the case where the court ordered Mr. Carlson to produce his computers, and the computer he uses at work for Baxter Labs for imaging, copying by the defendant in the case, ostensibly to find out if there's anything stored in there that might help them prove some defense against him. I believe the overriding issue, or overriding question here, is how to square up or match up the protections given to privacy by Section 6 of our Constitution, personal privacy, with what, at some level, is a right of each party to conduct discovery from the other party. And I think the problem that developed below was that the trial court really had no particular guidelines to assist it in determining how far to go. And what we've suggested to the court is that, although surprisingly not to the extent I would have expected on a national basis, other courts that have faced this issue have suggested a series of guidelines, and in particular the Colorado case, the Gateway case, was very specific. And the three points it raised, and I would suggest that they are the three compelling points here to guide this court and to guide further trial courts, there needs to be a compelling need. There needs to be... the information must not otherwise be available. And searching my computer has got to be the least intrusive way to get that information. And how do you do that? How do you accomplish a search of the entire database of a computer that is not intrusive? You could not. I'm trying to assist the court in that regard. I guess it depends what you mean by intrusive. It's almost impossible not to be intrusive. I think with Colorado, what the Gateway court was saying is that before somebody searches my computer, we have to find out if there's some other way to get that information. I don't think they meant that you could search if it wasn't intrusive. You should not search if there's another way to get the information. And in this case, however, there is at a different level an answer to your question. This case is unusual, as far as I can determine, in that we have been required to produce our computers, and by our I'm speaking pretty broadly because we don't own the Baxter computer, to somebody else. Most of the cases involve the scenario where someone comes to me and says, Mr. Ratzak, here's what we want from your computers, and the cases have got this set up, and here's the protocol you need to search. That would be a less intrusive inspection  I am looking at my computer. That requires a bit of trust, though. Respectfully. So where's the balance here? If I say to you, you're the fox in the henhouse, you're going to search your computer and give me what falls within this parameter of disclosure, as opposed to I want to look in the box and see what falls within my parameters of ordered discovery. I would suggest that by saying that's a much bigger fox in my henhouse. Yes. Because now everything I have is up to you. My best answer to that is that this has been standard procedure in the federal courts for 10 or 15 years. That's why the issue doesn't come up. One side tells the other side what to look for, and they do it actually by furnishing a protocol that tells them here's the search terms. I mean, it's being done in huge litigation cases where we have rooms and rooms full of documents, and apparently it works. I think the bottom line is that when the information comes back to the other side from my computer, they may have further questions. They may be able to test it. So it's a model of question. It is. And frankly, because if I deliberately do not take something from my computer and produce it to you, it's just the same as if you have to trust me when the other side tells me I want production from my work files for their construction site. If I don't take something and put it out there, I have violated my duty. And I suppose on a really practical level, the fear of being caught is still operative in this world. And when we're talking about computer information, it's usually everywhere. So it's no different than the written form with respect to discovery. And how about... I'm sorry. I think there's a distinction there. Oh, certainly there's a distinction, but I'm saying what you're saying, there's no distinction. You're going to be turning over either electronic or written the same way. Absolutely. If there was something about Mr. Carlson's game rule plan that involved printing something out, for example, at the end of the week to show who's ahead, that would be papered relative to the game plan they wanted to look at. And I'd have to produce that. I suppose I could cheat and not produce it. I think most lawyers know not to do that, and I think most parties know not to do that. In this particular case, were they clear on what it was they were looking for from this computer? That's my objection. They were not. And although the word metadata was used a lot, the idea that someone could come into my computer and tell me whether I'm acting slower or faster or more expeditiously than I used to, it's almost... I can't understand how you do it. All they could do, and I'm not sure that that's possible, is to show when I turned my computer on and when I turned it off. Or they could show that I could access... I sent my e-mail to my sister this morning at such-and-such a time. Feasibly they could. But beyond that, the information that they saw has not come with the set-apart... It came with no protocols. Every case that's addressed this issue where they've gone into depth, there's been a protocol set up, and the Court has had a protocol before, mostly federal cases. These are the terms we want, and it's actually hashed out between the two computer experts in advance. Does it require an expert to set forth a protocol? Yes. I only say that so happily because my background happens to be physics and math. How'd you end up in law school? A long-said story. I was not good at physics, it turned out to be. That's the correct answer. But just beyond what I think, if you just think about, if you analyze what could be found here, there aren't any parameters that have been given to anybody here, and we do need experts. Even the other side, in the July argument, the other side said to the Court and explained why they should get our computers rather than having us search our computers. They said, well, Mr. Carlson could not get this information out. It takes an expert. That's in the July transcript. But that doesn't mean it has to be an expert of the other side. Not at all. An expert, right? That's correct. And there is, buried in my brief someplace, a citation to a court that says this does require, some court concluded it requires an expert to really do this, especially when you think about the sophistication with what they want to do. This is not a case where they're going through our computer and looking for documents. If it was a contract case and you wanted to see whether I had drafted a letter, you can put in the terms of the contract and it will bring up those documents from my computer. They want to look at what I was doing with my computer, how long it took. And what's that supposed to prove? Their theory is that it will impeach Mr. Carlson. And that suggests— How will it impeach Mr. Carlson? I don't know. I don't believe it can. I thought that the argument for the discovery was he claimed brain damage from the accident. He was injured such that his IQ has diminished or something to that effect. Correct. And so therefore looking at his computer and his metadata will somehow establish some diminution in his brain function. That's correct. Did they ever explain to the trial court how that was supposed to be established? No. Nor has any, I think significantly, nor have any of the expert psychiatrists in this case said they could use or need that data, keeping in mind that there's no psych exams going on.  They could search a computer that would establish those things. I believe I've read every such case. I can admit I'm in the country. I haven't found anything that's even close to this in terms of the depth of the request. Let's move on. We're talking about discovery now. I want to move on to this affidavit. Yes, Judge. Would the court deny your ability to enter this affidavit from— was it Abbott or Baxter? From Baxter. Yes, they're relocation counsel. Into evidence? Correct. First of all, do you feel that the court was kind of shifting the burden here with respect to discovery to you as opposed to placing the burden on the defendant? That was plaintiff's counsel's argument down below. You want me to do what? It's not my computer. It's not my client's computer. It belongs to Baxter. Why are we involved in this? And the court said, well, one of the responses early on was, well, counsel, shouldn't you have notified Baxter? We don't want anything from Baxter. If the defense wants something from Baxter, if somebody wants something from an employer, it would seem that the burden should be on the person that wants it to bring them into the case. In this case, Baxter didn't even know about this until the last minute because the accusation that we leased the computer did not come up until the September 23rd hearing. And it turns out it was not correct. Baxter, as you might guess, and as the trial court judge surmised, does not lease its computers to its employees. That's what the affidavit shows. Now, I admit, their brief, I think at page 7, says that the computer was assigned to Mr. Carlson. Somebody told them. One person. I think the girlfriend used the term leased or something, correct? The term leased comes from Mr. Marasco. His deposition was not given to the trial court. It can be found in the record because it just happens to be there. But Mr. Marasco was Mr. Carlson's friend and supervisor at this job. So I'm arguing outside the record. It wasn't in the record. Counsel came to court and said it was leased. He didn't say why. I forgot who was there. The counsel said it was leased but didn't say where it came from. I found where it came from by looking back at the deposition, which happens to be in the record. And I've quoted the question. And the answer to the question was to Mr. Marasco about the computer. He said, well, I don't know who owns the computer. Baxter leases them. Well, that term doesn't mean Baxter. I don't think that term could ever be construed to mean Baxter leases computers to its employees. It just means instead of buying them from somebody, it leases them from somebody. But in this instance, their brief says the computer was assigned. My impression is that they've surrendered at that point. That they agree it's Baxter's. I'd probably have to wait for a ligament to conclude that. My point being, though, is that the trial court did not allow this affidavit to come in. They were denied. Did the plaintiff down below ever ask, make an offer of proof or put this affidavit in for judicial notice? They did counsel. The history was the counsel only got it from Baxter the night before the October hearing. When he came in, all he could do was offer it. He did not have an affidavit. The court said an oral motion is not good. I want a written motion. He came back with a written motion for leave to file the affidavit and attach the affidavit and two letters of explanation from Baxter, which had been sent to both attorneys, explaining Baxter's position on the case. And the court denied it at that point. The court said it should have been filed with a motion for reconsideration. This was not a summary judgment hearing or a motion to dismiss where there was some definitive point. This is an ongoing discovery process, and I don't believe counsel really thought after arguing here three weeks ago that the judge forgot what he wants. He wants this affidavit in the record so that the court will understand the issue of leasing. It's just a very basic fact question. The only objection the defense counsel had to it, that was not the objection. So I don't understand that they even objected to it on the grounds that the trial court excluded it. But the bottom line, I think, comes back to the scope of what one party is going to be able to cause another party to do and keeping in mind that if this court, or if the trial court on remand, carries out an order to produce, there's two things. The court can either, this court and the trial court, produce all these computers, or it can flip it around and say the other side can ask us to search our own computer. Either way, even though the search is for nothing more than impeachment, that they admitted that, they don't have anything in here that's substantive on the case. It's going to involve experts, and experts in computers are expensive, and I see in the long haul, as I said in my brief, you're going to have, and it's going to be a plaintiff and defense thing mostly, you're going to have somebody with a big wallet and somebody with a little wallet, both spending money on computer experts. If you read the federal cases, that's what they talk about proportionality. Proportionality was inserted into our rule 201 just for that purpose, so that if you're going to look for something and it's going to be expensive and it's going to take a lot of time, I first have a duty to say what I'm looking for and why I can't get it someplace else. I don't think that's been done there. It truly was not done below, done down below. Sorry. Anything further? Yes. Since you think that it wasn't done below and it should have been done, do you think that the relief that we should be granting is remanding it back for the trial court to reconsider based upon proportionality? That would be one of the avenues of relief. If that is going to be the avenue, then I would ask the court to adopt the Colorado Gateway case guidelines so that there are some specific guidelines here. My basic request is that the court simply say, in this case, none of those criteria have been fulfilled. I think it would clearly help the legal community on both sides if we had some guidelines, but even if we apply Gateway, I believe the facts show that they're not entitled to a hearing. Maybe something might change in the case. There can't be a definitive order. This case is a long way from completion, yet they're still waiting to take the mental psych test. Has the defendant been given the opportunity to actually contemplate what it is that they're looking for such that by granting you such relief as you indicate was basic, it would essentially result in a default or a situation where they wouldn't be given the opportunity to have a proportionality analysis, and they would be given on remand the opportunity to try to explain how anything on the computer could be probative of brain injury. I understand your court's question. You can understand my reluctance to let that door get opened up. I can't concede to that. They had an expert. It's clear from the record they have an expert. Their expert advised them. They told the court, this is what our expert said. So they've had somebody along the way who could have advised them on this. They didn't. To make us go through an appeal and then now come back and say, well, we should have done this the first time and we would have saved you all this work, strikes me as being a little late. I don't mean to sound facetious, but this is not a particularly complex case. This is not some sort of an antitrust case where all this discovery must be done. Although the injury is tragic, the mechanism is simple, and the condition is not particularly unknown. We're not talking about an injury here that nobody ever saw before so that they need to do a lot of research to find out about it. Cognitive injuries are not that hard to diagnose. Underneath it all, I ask the court to keep in mind, their own psychiatrist is going to do a neuropsych exam, and they have the advantage of here, I've only seen this once before, there happens to be a neuropsych exam before the accident and after the accident. It's like having x-rays before my accident and then afterwards, and somebody can look at them and say, well, breast, sex, and that was good or bad before, or did it change or didn't change. All that means is it simply wasn't necessary in this case. It's a burden being pushed upon us, and it's a burden that's going to cause Mr. Carlson a terrible problem with his employer. We trust him. He's got this great job that's practically made for him. They've kept him there even though he's got a cognitive brain injury. Nobody doubts that that's there. We don't want to see him lose that. Unless the court has further questions. Thank you, sir. That would conclude my argument. And you'll have an opportunity in the rebuttal. Thank you. Thank you. Ms. Dekic. Good afternoon. Good afternoon. I'm Melissa Dekic appearing on behalf of defendants. I don't think we need to look to Colorado because Illinois has rules in place, and particularly Rule 201. Rule 201 discusses electronic data, computer data, metadata. And the rules governing that take into consideration proportionality. We've been talking about proportionality, but proportionality is spelled out within 201 of the conditions. Does the discovery outweigh the likely benefit taking into account the amount of controversy, the resources of the parties, and the importance of the issue in litigation and the particular discovery requested? Well, isn't this, and I hate to use the old common phrase, a fishing expedition? I mean, you come in with really no firm evidence that you're going to find this, but you think if you copy this hard drive, you may find it. Whether it's a computer or whether it's somebody's box of paperwork at home, you need to have more than that just to say I want to come in. Give me your box of tax returns and box of paperwork. I'm going to look through it. This is no different. I believe that it is different. Judge Wicker initially thought that this was a fishing expedition. She understood that computers are very relevant to this litigation because he is a computer programmer, spends a good deal of his time on computers. But she was going to reject the request, but she gave us additional time to provide an order of protection, which not only limited the searches, but added precautions to protect the privacy of the plaintiff. This situation is a little bit different, and every discovery issue is very fact-dependent. The plaintiff in this case is claiming a brain injury. Since the accident, his cognitive abilities have been impaired. He has trouble working now. He gets to work later since the accident. He is fatigued at work since the accident. It takes him longer to work on any particular project since the accident. Let me ask you, if you go on the computer and you see two projects that he did, one before the accident, one after the accident, how are you so sure that it took him longer or shorter based upon the complexity of the project that he was doing? Well, I think that might be the next step in the argument after we see the evidence. I think the first step is just to say, is this true? He doesn't punch a clock. His supervisor at work has said, you know, he gets great reviews. He seems to be doing better, and yet he tells me that he has these difficulties. We're getting very mixed evidence. Isn't there another way you can get this evidence, i.e., psych records that, as your opponent said, he had before and after, the doctor's reports? I mean, can't you get this information some other way instead of trying to invade the privacy of somebody's private computer, personal computer? Well, a lot of that information is going to be on what the plaintiff reports. We're counting on his own reporting. What about the good old days when we were counting on people's trust in self-reporting? So it's different today because now we can track people down with their computers? Well, I think let's backpack just a minute. I understand your question, and I do want to answer that. But if the plaintiff, if we have access to this information, this particular information about, is he researching symptoms? Okay, that's a good point, researching symptoms. So if he's researching symptoms, does that mean then he's malingering or he's making up his symptoms? Don't people research symptoms all the time? All the time people do it. Don't tell me you don't do it. I think we all do it. So does that mean, therefore, he researches symptoms, so then the natural progression is that since he's researching them, he's going to make up and malinger and say that these are his symptoms? How are you going to prove that? Well, he's been keeping a very detailed log. I don't, it's in the record. It's dense, it's daily, and it's very detailed. And he says he's stopped. We have testimony that maybe he hasn't stopped, maybe he's still doing this. If he is researching these specific terms, and we're not saying any term, we've listed in a protective order a few terms, ice pick headache, unbalanced IQ. These are things that didn't show up in his medical records, and he's been reporting them. Is he still reporting them? I think that might be fair game. What this search does not do is have a wholesale access to his computer to pull any information. This search is very tailored. The search basically is comprised of time stamps. So this isn't content-based. It's time stamps. When did he log on to his work computer? Was it at 10 o'clock? Was it at 9 o'clock in the morning? Did he really log off at 10 o'clock at night as he claims it because he's working late? How are time stamps, if that's the basis of it, assuming that he's using something like Windows where you open tabs or open Windows, how, if he opens his work window and then spends the next five hours in his e-mails on different windows and tabs, how are the time stamps going to establish that he supposedly is working someplace other than at work or not? I mean, is the class half full or is it half empty? Was it filled half originally or was it filled full originally and now somebody emptied half? I mean, all these things that you're talking about, how do they establish the negative or the affirmative or do they establish anything? Well, it's evidence and it could lead to admissible evidence. As to the weight of it, that might be a different argument. Isn't that a fishing expedition? I don't know. Which you just defined. It's evidence that could lead to some discoverable evidence. Under the Illinois rules, that is the purpose of discovery. But the purpose of discovery is it has to be relevant and material evidence. Good. Relevant and material. The plaintiff has put into this case the fact that since the injury, he has trouble working. He has to work late. He gets thieves, sleeps in. He suffers from fatigue. One of his main hobbies is online gaming. He has been unable to enjoy his hobby, although there's testimony from his friend and housemate that he spends an enormous amount of time gaming and he games on the computer that he has from Baxter. We want to just test when is he on his computer. If he's on his computer all night, then how do you know he's on his computer? I'm sorry? How do you know he's on the computer? Because the computer will have evidence of use. When it's on use. But used for what? Used for what? The content is not quite as important. If he is gaming, I don't care what his average score is. What if he's on the computer from 10 o'clock at night until 3 in the morning emailing people or researching or doing something else? You're not going to know when he's gaming. Isn't that an alternative cause for his fatigue at work? He's blaming his fatigue at work on his accident. You're blaming it on gaming. How do you know he's gaming? How are you going to know he's gaming? Because in this particular case, he spends an enormous amount of time on a computer. This wouldn't be an issue if he was a computer programmer and he broke his leg. Likewise, computers wouldn't be an issue if he was an elementary school teacher. But the problem is he says he is now cognitively impaired. Tools of his trade, everything he does, not everything, that's an exaggeration, but he spends an enormous amount of time on computers. What is metadata? Metadata is kind of broadly defined. It's data about data. There can be metadata, for example, on a spreadsheet. It's basically the formulas behind the application. If it's data about data, is the data, the underlying data, is that personal information or is that data that relates to nothing more than places visited, files visited, addresses visited? Yes, it does encompass that. If that's the case, why do you need a mirror image? Why don't you just have a protocol and have the protocol typed in and hit enter and then print out whatever the protocol supposedly gets? The problem with that, there's been some federal cases, and the creation of a mirror image is to prevent the destruction of any data or to mess up anything on the original computer. So you're telling me that when you put a protocol in and you hit enter, you may damage the computer? I don't know. It's happened in some of the federal cases. That's why they put this protection. It's not to, we want to make a copy of your computer and take it away. It's so we can run these analysis. There is no— Well, it's the we. Why is this type of discovery different where it's your expert that runs the search, if you will, as opposed to here opposing side, I'm looking for this, this is what, and in the old days we would gather that and tender it. What has changed that makes it now okay for you to look through my things as opposed to me to look through my things and tender what has been requested? Well, part of this is I don't know that if somebody asked me to produce the metadata from my computer, I would have no idea how to do that. We're talking about experts. Why is it your expert versus plaintiff's expert? Well, I think the important thing is it's a third-party expert. I mean, we will pay the expert. Well, that's very generous of you, but the issue is privacy, not how much it costs, although I appreciate that's one of the concerns for probation. But the overriding issue here is also privacy concerns. So why your expert, not my expert? Well, I think it's the point is we couldn't say, Your Honor, below, we want you to get an expert and get all the costs for this. We were bearing the costs. It's part of a proportionality example. It's still a third-party expert, and defendant, or I'm sorry, plaintiff, can be there with the expert and supervise. Defendants won't be. There are steps in place. The expert will look at this data, and what is the expert really looking for? They're not looking for content. The expert is going to be looking for time stamps. When are these computers being accessed? Is it day and night, all day? And then limited searches for certain search terms that are set out in the protective order. They want to know if the plaintiff is still tracking his symptoms and if he's looked for some of these search terms because they don't show up in his medical records. How is that last search you're looking for, terms, how is that going to be any different on any other rear-ender case or PI case or Med-Mal case in the state of Illinois? How is it any different? Every single discovery case that we have now in the state of Illinois, the defense is going to be saying, I want a metadata of their computer to see if they're searching MCL tears or to see if they're searching C4 ruptures of the disk. How are we going to do that? We're going to open up this big floodgate for discovery in the state of Illinois on people's computers because there's searching terms. Don't you have to have reason to know that that individual is searching terms before you ask for this? Reason to know? Don't you have to have some basis for asking someone to turn over their computer to determine whether or not they're searching specific medical terms? You can't just say, well, you know, he has a blog and he's saying that he has ice pick headaches. Therefore, he must be searching that term. What is your basis and what's going to be the basis of every other defense attorney in the state of Illinois for asking for somebody to turn over their computer to see if they're searching their medical symptoms? And just because somebody is searching a medical symptom, does that mean that they're going to malinger and make up symptoms? Well, I think some of this is putting the cart before the horse. Of course people might look up their symptoms. It doesn't mean they don't have them, but it certainly could mean that they're creating them. It could, but don't you have to have some type of threshold basis in good faith to believe that you're going to find something there. Now, I mean, why didn't the plaintiff go to a local public library and use a pseudonym and look it up? I mean, what's your belief that it's on this computer before you ask a court to let me search it? Well, there is some discussion, and it's in the record, of some of these terms were used. Ice pick headache, for example, is not common parlance. It's not, I have a migraine headache. We want to know, and plaintiff is listing all of these symptoms, that we have difficulty because... Oh, you're not off the hook. Keep going. Because in this particular case, the plaintiff's claims are rather nebulous. They are work-related. We don't have an expert who can just say... Even if that's all true, and I don't mean to cut you off, but even if that's all true, where's your belief in good faith that that search took place on this computer or any one of those five computers? Why didn't he go to the library, use a friend's computer, ask someone else to do it for him? You see, at some point, I think maybe what you mentioned earlier is trust. I mean, we could never... Ask him, say, did you look these things up? I mean, is there another way? Well, I think we did, but I think, as Judge Winter knows, we also get to test his claims. You know, he says, no, I didn't look up anything. Okay, you didn't look up anything. Then how do you know the term ice pick headache? Ask that question. And then what does he say? Someone told me that. A friend told me. Whatever. I went to the public library and looked up ice pick. It felt like somebody had an ice pick and was sticking it in the side of my head. I mean, I guess what we're driving at is you can ask for disclosure. There has to be some threshold to invade someone's personal privacy. And as I understand from opposing counsel, there's no protocol here. There's no specificity of what I'm looking for and why that is relevant and material to this case and why I expect to find it there. I mean, it goes back to the classic example of what is a fishing expedition. I don't know that he used this computer to look up symptoms, yet you say I want to go see if it's there. How about this? A discovery question in a deposition, how did you come up with the term ice pick headache? I looked it up on my computer. Bingo, right? Then I'm going to turn over the computer for you to search that. How else then can we determine whether he's truly having these difficulties at work? How did you determine that prior to computers? Prior to the opportunity to invade somebody's privacy? I guess that's the way I would start with some discovery, some deposition discovery to determine if you can discover that another way. And what have the depositions taken in this matter? There is inconsistent testimony. Let's go on to a different area because your time is up. Since this is so interesting, I want to ask you about this affidavit. Why did the court not use its discretion in denying the ability for the plaintiff to file that affidavit from Baxter? Well, in September of 2015, the court issued its discovery order and protective order. Prior to that, as of March, the plaintiff was aware that defendants were seeking the information found on his work computer and personal computer. This was a long time coming. And after the court entered its order, plaintiff did not seek to reconsider that discovery order. Plaintiff immediately filed a motion basically saying, find me in friendly contempt. At that time, the court said, well, the order was inappropriate. You didn't attach a copy of the discovery order. This motion isn't proper. Refile it. At that time, he also said, oh, we just got this affidavit from Baxter. There is really no basis for this delay. So timing, the type of timing is terrible. And he didn't file the affidavit in connection with anything. What was the court supposed to do? They actually said, we just want to make this part of the record. So obviously the intent was to have this court consider the affidavit. They didn't care whether or not Judge Winter considered the affidavit. Did the court put the burden on the plaintiff to bring in Abbott to prove that the computer was theirs for Baxter? The court did state, if you are disputing turning over the computer for this inspection, why didn't you go to Baxter earlier? And the affidavit itself, I mean, if Baxter has concerns, Baxter never came. Did you ever advise Baxter to reach out to Baxter? Your Honor, it's not in the record, and I don't know. Okay. Any further questions based upon the memo? One of the parameters, the order of discovery related to providing deleted material, and I'm not quite sure I understand how you can provide deleted material. I know that files on a computer aren't technically deleted. What's deleted is the address on the hard drive that is affiliated with a file. And as I understand it, the hard drive erases that so that the file can't be found. And ultimately, if it fills up full enough, it will record over that file. But the file doesn't get destroyed or typed over, so to speak. And so what was the point of asking for deleted material if you're getting or seeking a mirror image? The mirror image was going to pull, and again, this is why we have computer experts to do this. I am not a computer expert and don't profess to be. But it is basically the information in the, I would say, the hard drive, the outer drives of the computer, that there is still, even if it gets pushed or put to a different file, there's remnants of this information remain. Still on there. And that's what the experts would be able to find. I think it's important, and I know my time is way over. Your time is way over. That's okay. Thank you. Mr. Assange, thank you so much for your argument. Thank you. Very briefly, although I know the Court's heard that phrase before. Yep. The leasing, producing Baxter's computers did not come up until September. That's when the lawyer told the trial court that it was leased. It's in the September 23rd hearing. That's the first time plaintiffs say, whoa, Baxter Laboratories, their computers, what's this? Their only objection to our affidavit was that it wasn't timely, that we should have objected to Baxter having to produce the computer earlier. But we didn't know until September that Baxter's computers were in play. Was he saying he didn't submit the affidavit until March, I think? No. We came to court in September. In September, that's when the defense counsel told the court the computer was leased. The letters are with the affidavit and the motion for reconsideration. We came back in the next hearing in October. We told the court that we'd been communicating with Baxter in that short period. And the court said, that's oral. I want something in writing. So the very next hearing, which is just within about a four-week spectrum, we said, okay, now we've got an affidavit. We don't just have a letter from Ms. Padgett. Ms. Padgett, we have an affidavit. We did this all as quickly as we could. There was no way counsel could have, that I can see in the record, that plaintiff's counsel could have done any better. The other point I want to make is that as it came out in the oral argument, as it did below, they're really looking, they said, why do we want to trust the plaintiff? We were skeptical about his responses.  All said, skepticism about discovery is not a grounds for this kind of invasive, even mirror image computer examination. And I would, unless the court has further questions. Just one last question. You spoke at length about protocols in your prior argument. Is it your position that any protocol must include components of relevance and materiality? That would be our position. Because otherwise the trial court is simply not going to know if what I want is something that's material or relevant or reasonably likely to lead to that spot. At this point, I don't know. The trial court couldn't possibly know what they were looking for or what they could do with it if they found it. I have nothing else. Unless the court has other questions, we've occupied this time for longer than usual. What's your definition of metadata? I don't know that my definition would be really helpful. Simply, it's data that is in the computer, not necessarily the document I'm working on, but information about the document I'm working on. That's about the best I could do. Beyond that, I would be offering a computing without much foundation. Does metadata include the machine language that supposedly runs the computational or the way in which the computer processes the bytes or bits? I don't know the answer to that. I would simply be guessing. Thank you. Thank you, counsel. Thank you. Thank you so much, both of you, for your very, very interesting argument before us today. We appreciate the time that you have taken to come to court. We will take this case under consideration and render a decision and, of course, have safe travel back. Thank you. Court is adjourned for the day.